FILED
2016 Sep-26  PM 04:44
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF
ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| TASHA NICOLE HOBBS, | ) |
| | ) |
| CLAIMANT, | ) |
| | ) |
| v. | )   CIVIL ACTION NO. |
| | )   5:15-CV-389-KOB |
| | ) |
| CAROLYN W. COLVIN | ) |
| ACTING COMMISSIONER OF | ) |
| SOCIAL SECURITY | ) |
| | ) |
| RESPONDENT. | ) |
| | ) |

MEMORANDUM OPINION

I. INTRODUCTION

On September 30, 2011, the claimant, Tasha Hobbs, protectively applied for

disability and disability insurance benefits under Titles II and XVI of the Social Security

Act. (R. 186). In both applications, the claimant initially alleged disability beginning

February 1, 2001, but later amended her alleged onset date to April 1, 2008 because of

affective mood disorder, history of seizure disorder, and fibromyalgia/chronic pain

syndrome. (R.188). The Commissioner denied the claim on February 14, 2012. The

claimant filed a timely request for a hearing before an Administrative Law Judge, and the

ALJ held a hearing on April 24, 2013. (R. 206).

In a decision dated June 4, 2013 the ALJ found that the claimant was not disabled

as defined by the Social Security Act and was, therefore, ineligible for social security

benefits. (R. 199). On January 31, 2015 the Appeals Council denied the claimant's

requests for review. (R. 1-7). Consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. The claimant has exhausted her administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§405(g) and 1383(c)(3). For the reasons stated below, this court reverses and remands the decision of the Commissioner to the ALJ for reconsideration.

## II. ISSUES PRESENTED

The issue before the court is whether the Appeals Council erred by failing to remand the case to the ALJ for reconsideration after the claimant presented new and material evidence.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the ALJ's decision if the he applied the correct legal standards and if substantial evidence supports his factual conclusions. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No…presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 402 (1971).

The court must keep in mind that opinions, such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors, "are not medical opinions,…but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets the listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not only look to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less

than 12 months….” 42 U.S.C. § 423(d)(1)(A). To make this determination the

Commissioner employs a five-step, sequential evaluation process:

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific
>     impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the
> next question, or, on steps three and five, to a finding of disability. A
> negative answer to any question, other than step three, leads to a
> determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986)[1]; 20 C.F.R. §§ 404.1520,

416.920.

Generally, a claimant may present new evidence at each stage of the

administrative process. *Washington v. Comm'r of Soc., Sec. Admin.*, 806 F.3d 1317, 1320

(11th Cir. 2015). The Appeals Council has the discretion not to review the ALJ's denial

of benefits. *See* 20 C.F.R. § 416.1470(b). But the Appeals Council "must consider new,

material, and chronologically relevant evidence" that the claimant submits. *Washington*,

806 F.3d at 1320; *see also* 20 C.F.R. §§ 404.970(b), 416.1470(b). "When the Appeals

Council refuses to consider new evidence submitted to it and denies review, that decision

is subject to judicial review…." *Washington*, 806 F.3d at 1320. When the Appeals

Council erroneously refuses to consider evidence, it commits legal error and remand is

appropriate. *Washington*, 806 F.3d at 1321. This court has the authority to remand a case

---

[1] *McDaniel v. Bowen*, 800 F.2d 1026 (11th Cir. 1986) was a supplemental security income case (SSI). The same sequence applies to disability insurance benefits. Cases arising under Title II are appropriately cited as authority in Title XVI cases. *See, e.g.*, *Ware v. Schweiker*, 651 F.2d 408 (5th Cir. 1981) (Unit A).

based on such evidence pursuant to 42 U.S.C. §405(g), under a sentence four remand or

reversal. *See* 20 C.F.R. §§ 404.940, 404.946.

Evidence is material if a reasonable possibility exists that it would change the

administrative result. *Washington*, 806 F.3d at 1321. Evidence is chronologically relevant

if "it relates to the period on or before the date of the [ALJ] hearing decision." *See* 20

C.F.R. § 404.970(b), 416.1470(b). Medical opinions based on treatment occurring after

the date of the ALJ's decision may still be chronologically relevant if the records relate to

the period on or before the date of the ALJ's decision. *Washington*, 806 F.3d at 1323.

V. FACTS

The claimant was 25 years old at the time of the ALJ's final decision. (R. 197).

The claimant has a high school education and past relevant work as a shipping and

receiving clerk, hand packager, and cashier. (R. 197). The claimant alleges disability

based on affective mood disorder, history of seizure disorder, and fibromyalgia/chronic

pain syndrome. (R. 188).

*Physical and Mental Impairments*

In January 21, 2004, the claimant presented to Dr. Jean Teasley at Children's

Health System after experiencing a generalized tonic-clonic seizure. Dr. Teasley noted

that an EEG showed "bilateral frontal greater than"generalized epileptiform" activity and

that the claimant reported headaches once or twice a month that she treated with

Ibuprofen. Dr. Teasley recommended that the claimant take Diastat as needed for seizures

greater than seven minutes or more than one seizure per hour. (R. 601-602).

The claimant visited Dr. Teasley's office again on February 3, 2004 for a routine

EEG that showed normal background activity for her age, with occasional evidence of

5

bilateral frontal greater than generalized epileptiform activity. (R. 600). Three months later on May 5, 2004 the claimant reported to Dr. Teasley that she had experienced two nocturnal seizures; woke up with a headache; and had difficulty walking because of weak muscles. At the same visit, the claimant's mother also told Dr. Teasley about an episode where the claimant seemed "out of contact" for five to seven minutes. Dr. Teasley noted that the claimant was having ongoing seizures and had not been using the Diastat. (R. 599).

On March 29, 2007, the claimant sought treatment with Dr. Richard P. Hull at The Clinic for Neurology for complaints of seizures and headaches. Dr. Hull noted that the claimant had frequent absence attacks and extremity myoclonus in the past,[2] but that she had no more generalized tonic clonic seizures since the age of fourteen. At the same visit, the claimant reported having headaches once or twice a week that lasted last for two to three days, with a throbbing pain; worse pain with movement, light and noise; nausea; and rare vomiting. She reported taking Relpax, Maxalt, Axert, and numerous over-the-counter medications for her pain without effect and Topamax and Keppra for her seizures, absence, and myoclonus. He noted the Topamax was not effective for the absence, myoclonus, or headaches, and that the Keppra was effective for the seizures but not the myoclonus. Dr. Hull prescribed a low dose of Amitriptyline to treat the claimant's migraines. Dr. Hull diagnosed the claimant with intractable migrainous headaches and generalized seizure disorder with absence, myoclonus, and generalized tonic clonic

---

[2] Absence attacks are also known as metit mal seizures and are characterized as a brief loss and return of consciousness, generally without a period of lethargy afterwards. Myoclonus is a brief, involuntary twitching of a muscle or group of muscles. *See* Epilepsy Foundation, http://www.epilepsy.com/learn/types-seizures/absence-seizures; Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/myoclonus/home/ovc-20166171.

seizures. (R. 740-742).

The claimant had an EEG on April 4, 2007 that showed "patterns of generalized seizure potential." (R. 747) The claimant met with Dr. Hull again on May 10, 2007 and reported having no migraines since beginning Elavil,[3] but reported continued infrequent myoclonus. The remainder of Dr. Hull's examination was unremarkable. (R. 737).

On December 19, 2007, Dr. Hull noted that the claimant had no seizures since her first visit on March 29, 2007, and that Elavil controlled her migraines.

On July 7, 2008, the claimant visited Dr. Hull again and reported having a breakthrough seizure after a myoclonus episode during her sleep. The claimant was no longer having daily migraines, but continued to have migraines once per month. (R. 733-735, 747).

Paramedics came to the claimant's residence on July 30, 2008, because she was having seizure activity. Paramedics noted no postictal state[4] after the seizure and transported the claimant to Huntsville Hospital. Dr. Mark Eich treated the claimant and categorized her seizure as a Grand Mal, but otherwise had unremarkable findings. Dr. Eich also noted that the claimant reported to be under a lot of stress. (R. 780-785).

The claimant continued to visit Dr. Hull at The Clinic for Neurology every six months. In December 2008, the claimant reported that she was seizure free since April 2008,[5] and denied any myoclonus episodes. The claimant had not taken Elavil for one month and had migraines three to four times a week. In March 2009, the claimant again

---

[3] Elavil is the brand name for the drug amitriptyline.
[4] A postictal state is the altered state of consciousness after a seizure, characterized by drowsiness, confusion, nausea, headache or migraine, and other disorienting symptoms. *See* Epilepsy Foundation, http://www.epilepsy.com/learn/epilepsy-101/what-happens-during-seizure.
[5] Contrary to this report, Huntsville Hospital records show that the claimant had a seizure in July 2008. (R. 780-785).

reported that she was seizure free, that she had fewer migraines, and that she was having one to two panic attacks per week since coming off of Elavil.[6] On October 6, 2009, Dr. Hull continued to note that the claimant remained seizure free, and that she was having migraines only monthly. He also recommended that she stop taking over-the-counter medications, like Tylenol, daily. (R. 726-728).

One month later, in November 2009, Dr. Hull noted that the claimant had no seizures or myoclonus, but had migraines two to three times a week. The claimant took ibuprofen for her migraine headaches without relief. He also noted that the claimant's one-month-old baby was not sleeping through the night and that sleep relieved the claimant's migraines. He directed the claimant to begin taking Elavil again and to start Inderal for her migraines. (R. 723-731).

Licensed Professional Counselor Kori Nitchen at the Mental Health Center of Madison County first diagnosed the claimant with Major Depressive Disorder that is recurrent, severe and without psychotic features on December 2, 2009. At this appointment the claimant reported that she had depressive symptoms dating back to 2001, but had an increase in symptoms of fatigue and tearfulness since the birth of her child. The claimant also reported possible post-partum depression, mood swings, and anxiety. She denied auditory/visual hallucinations, delusions, suicidal or homicidal thoughts, and paranoia. The claimant alleged having crying spells and not wanting to do anything. Dr. Piha at the Mental Health Center prescribed Celexa on December 9, 2009 for her depression. The claimant missed two appointments in December 2009 and January 2010.

---

[6] Hospital records show that the claimant was pregnant during 2008 and stopped taking Elavil during this time.

On January 27, 2010, Dr. Piha prescribed Prozac and Serax for her depression; added Oxazepam on March 29, 2010; and gave her samples of Abilify on April 29, 2010. On May 20, 2010, Dr. Goodson at the Mental Health Center substituted the claimant's prescription for Oxazepam for Klonopin and instructed the claimant to continue taking Prozac and Abilify.[7] (R. 698-721).

The claimant visited Dr. Hull again on May 20, 2010 and reported that Mental Health Center was treating her for post-partum depression. She also reported that, while she was headache free for two to three months after starting Inderal, she was beginning to have headaches almost daily. Dr. Hull noted that the claimant's optic discs were sharp, but his findings were otherwise unremarkable. (R. 504-06).

The claimant reported to Mental Health Center on June 14, 2010 that she was "doing very well," that her medications were working, and that she was excited that her son was turning one year old. On September 23, 2010, the claimant reported being very pleased with her progress and that she had been driving by herself. Her counselor reported that the claimant was making fair progress in alleviating her depression. (R. 689-697).

The claimant first reported to Central North Alabama Health Services with complaints of leg pain and body aches on a pain scale of 6/10 on January 14, 2011. Dr. Katoch reported multiple tender points, but otherwise found the claimant's examination unremarkable. He prescribed Ultram to treat her pain. (R. 571-572).

At the Mental Health Center on January 18, 2011, the claimant reported anxiety as her main concern. She had been watching children to make extra money, but they

---

[7] Mental Health Center does not indicate whether the claimant should continue Celexa and Serax in addition to her other medications.

made her nervous. (R. 684).

The claimant visited Dr. Hull on February 8, 2011 reporting that she was still having headaches three times a week, but was seizure free. (R. 503).

On February 9, 2011, the claimant reported to Central North Alabama Health Services that she was still having body aches and leg pain rated as a 6/10, and that the pain began with the birth of her son eighteen months prior. Dr. Katoch found the claimant's examination unremarkable, prescribed Lortab and Flexeril to treat the pain, and ordered a rheumatoid factor test. (R. 567-68)

Dr. Katoch first diagnosed the claimant with fibromyalgia on March 3, 2011. Her rheumatoid factor was negative, and she reported muscle aches all over her body with a pain scale rating of 7/10. Dr. Katoch noted multiple tender points all over her body and prescribed Lyrica and Savella to treat the fibromyalgia, in addition to her previous prescriptions of Lortab and Flexeril. The remainder of his examination was otherwise unremarkable. (R. 492).

On April 6, 2011 the claimant reported to Mental Health Center that she ran out of Klonopin because she was using it while she stayed up late taking care of her very ill father. Despite her request for the Klonopin that she "so desperately needed," a lab report showed no benzos in her system. Mental Health Center was under the impression that the claimant was selling her medication and stopped prescribing Klonopin. (R. 680-681).

On April 12, 2011, the claimant reported to Dr. Katoch at Central North Alabama Health Services that the Lyrica and Savella helped her pain, but still reported a pain level of 6/10. Dr. Katoch reported tender points all over her body and referred the claimant to Dr. Aggarwal for pain management. (R. 554). The claimant continued to visit Central

North Alabama Health Services once every four months, with her last visit on July 19, 2012. During this time, she reported a pain level of 3/10 on one occasion and a 0/10 on the remaining three occasions. (R. 542-52, 554-563).

The claimant visited Dr. Aggarwal for the first time on June 9, 2011 reporting a pain level of 6/10 and a 9/10 when the pain was at its worst. He diagnosed the claimant with chronic pain syndrome. She signed a narcotics contract with Dr. Aggarwal and started Lortab four times a day and Lyrica twice daily. The claimant visited Mental Health Center on June 14, 2011and reported an increase in depression because of her parents' health issues. At a follow-up visit to Chronic Pain Care Service on July 7, 2011 Dr. Aggarwal reported that the claimant still experienced pain with moderate tenderness in the lumbar paraspinal muscles, and that her range of motion was limited in the lumbar spine by 25%, with normal motor skills and sensation. He prescribed MS Contin twice daily and Fiorinal for pain.

The claimant also visited Mental Health Center on July 7, 2011. At this visit, Counselor Nitchen noted a decrease in the claimant's depression and anxiety and an increase in her ability to focus after coming off of Klonopin. She also discussed the effect of over medication on the claimant's ability to function on a daily basis.  (R. 514-516, 675-676)

On August 12, 2011, Dr. Yedla at Mental Health Center prescribed Trazodone to treat the claimant's depression in addition to her other medications. (R. 672).

The claimant visited Dr. Aggarwal once monthly until October 27, 2011. At each monthly visit Dr. Aggarwal reported moderate tenderness in the claimant's lumbar paraspinal muscles and poor sleep. During this time, Dr. Aggarwal reported that at Dr.

Hull's request the claimant discontinued Fiorinal due to a seizure risk, substituted the MS Contin for Roxicodone, and decreased the patient's prescription for Lortab. (R. 510-514).

Paramedics transported the claimant to Huntsville Hospital on July 20, 2011 for treatment of a laceration to the back of her head following a seizure at home that lasted approximately one minute. The claimant was confused and could not remember her family following the seizure. The claimant reported that her last seizure occurred two years prior in 2009. (R. 823-25, 872-74).

On September 27, 2011, Dr. Hull noted that the claimant had four seizures since her last visit in May 2010. Three seizures occurred while the claimant was asleep and the other while she was awake. The seizure while awake was a general tonic clonic seizure that caused the claimant to stop, stare, and become unresponsive. The claimant was regularly taking her seizure medication, but was stressed. Inderal helped her headaches, but she ran out of the medication. Dr. Hull also noted that Elavil continued to help her headaches. (R. 502).

The claimant submitted a Seizure Questionnaire on October 24, 2011 at the request of the Social Security Administration. In the questionnaire she stated that her last seizures occurred on October 23, 10, and 8, 2011; that she reported over five seizures in September; that her seizures last from one minute to five minutes; that she blacks out and becomes unconscious, chews her tongue and cheeks, and grinds her teeth; that her whole body jerks; that her muscles and head hurt after the seizures; and that she has to go to sleep after the seizure because of fatigue, which lasts a few days. She also stated that the Keppra contributes to her fatigue.

The claimant submitted a Headache Questionnaire on October 28, 2011 at the

request of the Social Security Administration. She alleged having headaches around three days per week; getting migraines after each seizure; experiencing sharp, shooting, persistent pain for days, which is aggravated by sunlight and sound; and having headaches that last for two to three days. She claimed that her headaches had  increased in severity; that Elavil does not relieve her headaches and makes her fatigued; and that she cannot go to the emergency room for relief because she lacks insurance and the noise in the waiting room makes her headaches worse. (R. 396-98, 400-02).

On November 4, 2011, the claimant submitted a Function Report to the Social Security Administration. In this report, the claimant reported that a typical day consisted of taking care of her own and her child's personal hygiene, walking 30-40 feet to her father's house and doing whatever he needs, fixing simple meals, and playing with her son. She indicated that she receives help from her mother in cooking and taking care of her father and son; she gets out of breath and feels pain when performing her personal care; and has trouble standing for long periods of time and can only clean for five to ten minutes at a time. She reports being unable to drive because of her seizures; taking an hour or two to buy groceries or shop, depending on how long she can walk that day; and getting confused during her migraines. She talks with others daily, but reports not being able to go out to social events with friends. She can get along with authority figures and follow written and spoken instructions, but cannot handle stress. (R. 403-11).

Dr. Sherry Lewis conducted a consultative evaluation on December 14, 2011 at the request of the Social Security Administration. Dr. Lewis reported that the claimant's chief complaints were epilepsy, low back pain, and depression. The claimant's physical examination revealed normal systems, and her joints were non-tender and without

swelling, deformity, or temperature abnormalities. She had full range of motion in all joints and had normal muscle strength in all major muscle groups. Her MCP and PIP joints were unremarkable, with normal grip strength, patellar reflexes, and dexterity. Dr. Lewis noted multiple trigger points across the claimant's body, ranging from her neck to her lower back. The claimant's straight leg lift was positive in supine position, but negative in the sitting position. Dr. Lewis also reported that the claimant was very sad and cried at one point in the examination. She opined that the claimant had seizure disorder, major depression, lumbosacral pain with radiculopathy, and probable fibromyalgia. Dr. Lewis also stated that the claimant was unable to perform any type of work. (R. 521-30).

Dr. Galusha, a licensed psychologist, conducted a consultative psychological examination on January 12, 2012 at the request of the Social Security Administration. During Dr. Galusha's examination, the claimant reported that her doctor had taken away her driver's license and encouraged her to file for social security disability insurance.[8] She reported a history of chronic depression starting when her father had a stroke in 2001. The claimant was oriented to person, place, and situation, and reported mild impairment in recent memory, but no problems with remote memory. Dr. Galusha did not observe any indications of psychosis, but the claimant reported that she saw people that others said resembled people who have passed away. She said they do not speak to her but sometimes appear to be whispering. She denied current homicidal or suicidal ideation. Her insight and judgment seemed fair, and she retained the ability to manage

---

[8] While Dr. Hull's medical records show that he had placed a driving restriction on the claimant sometime prior to March 2013 but later lifted that restriction in March 2013, the record contains no indication that he or any other treating physician recommended that the claimant file for social security disability insurance.

money and live independently. She reported that she could usually do most activities of daily living, including self-care and hygiene. Cooking, cleaning, and washing have become more difficult due to her legs giving out, frequent migraines, and fatigue which she described as both mental and physical. Her intellectual functioning was average and Dr. Galusha indicated that she was able to follow instructions, work well with coworkers and supervisors, and could manage stress. Dr. Gaulsha opined major depressive disorder, severe with psychotic features (provisional), seizure disorder, migraines, legs giving out, occupational/economic problems, problems with access to health care, and a GAF score of 65. (R. 532-34).

The claimant visited Dr. Aggarwal again on January 19, 2012 and reported continued pain and poor sleep. Her examination was unremarkable except for moderate tenderness in the lumbar paraspinal muscles. On January 30, 2012 the claimant reported to Mental Health Center that she continued to take her antidepressant medications; however, Counselor Nitchen noted difficulty determining whether the claimant was actually taking the medication because the claimant had not visited the Center since August 2011 and her medications were shipped to her residence. (R. 596, 670). The claimant visited Dr. Aggarwal four more times until October 25, 2012. During this time, the claimant reported continued benefit with her pain medications. She reported a pain level of 4/10 at her last visit. (R. 592-595).

At the request of the Social Security Administration, Dr. Robert Estock reviewed the claimant's record and considered the listings for affective disorders, spine disorders, and major motor seizures. Dr. Estock determined that the claimant had mild restrictions of daily activities and moderate difficulties in maintaining social functioning,

concentration, persistence, and pace. (R. 263-264).

On March 29, 2012, Dr. Hull noted that the claimant had poorly controlled seizures with the last happening in November 2011, uncontrolled migraines, over-medication with suspected medication overuse headaches, and fibromyalgia.[9] He noted that the claimant's "previous seizures" occurred in a cluster while she was under stress around the time of her relative's death. He noted that the claimant took many prescription pain medications, but was without insurance and had no income. She went to Central North Alabama Health Clinic as well as Dr. Aggarwal for pain management, and had a pain contract with Dr. Aggarwal. He reported that he tried to get the claimant to detox by slowly reducing and eventually discontinuing her use of Trazodone. The claimant reported decreased short-term memory; difficulty thinking, with slow response times; and "psychomotor slowing symptoms." Dr. Hull reported that his examination did not confirm any of these symptoms, but gave no explanation. (R. 937-38).

At the claimant's November 7, 2012 visit, Dr. Hull listed the claimant's medical conditions as chronic fatigue, depression, known seizure disorder, and medication withdrawal. He also reported that the claimant experienced fainting spells and did not drive because she tended to get lost. Dr. Hull opined that the claimant's list of medications may contribute to some of her symptoms of depression, confusion, headache, and apparent cognitive problems. Dr. Hull listed the claimant's last seizure as being in August 2012.[10] The claimant reported complex partial seizure episode frequency of several times a week, and every three months for generalized tonic-clonic seizures. Dr. Hull reported that missing medication, sleep deprivation, and stress exacerbated her

---

[9] Dr. Hull only noted fibromyalgia by history. This record is Dr. Hull's first mention of the claimant's fibromyalgia.
[10] No medical record documents seizure activity in August 2012.

symptoms.

The claimant's last visit with Dr. Hull was on March 6, 2013. The claimant reported headaches, migraines, seizures, and depression. Dr. Hull reported no seizures since August 2012, and headaches twice weekly, which the claimant had been treating with over-the-counter Ibuprophen after running out of Elavil. Dr. Hull proscribed Elavil again and lifted her driving restrictions. (R. 931-32).

The claimant visited Mental Health Center on March 14, 2012, reporting increased depression and feelings of not wanting to do anything. Dr. Yelda prescribed Celexa again and instructed the claimant to remain on Trazodone. After missing three more appointments, Mental Health Center discharged the client on April 10, 2012. From 2009 until her discharge date, Mental Health consistently assessed a GAF of 55. (R. 660-69).

*The ALJ Hearing*

At the hearing on April 24, 2013, the claimant testified that she and her mother, who lived in a house on the same property, took care of the claimant's three-year-old son. She stated that she feeds the child and changes his diapers, and that her mother helps with dressing him. The claimant testified that she was currently unable to pick up the child, but was able to do so previously when he weighed around 35 pounds. (R. 209-10).

The claimant testified that she does not work and has not worked since 2008, that she graduated from high school, and that she could not attend college because of her pregnancy. She testified that she experienced back pain as a result of receiving an epidural in her back during her pregnancy. This back pain made her unable to work around 2009. She testified that her back pain made her unable to stand, sit down, or walk

for long periods of time. The claimant could stand and walk for approximately 30 minutes before having to take a break. The claimant testified that she goes grocery shopping, but after 30 minutes has to sit down and let her mother finish the shopping. (R. 211-12).

The claimant testified that Dr. Hull suspended her driver's license because of her epilepsy. She testified that the suspension occurred in 2010. She also testified that she experienced seizure activity at the beginning of April 2013. (R. 212).

The claimant testified that she is unable to perform work because she has difficulty getting around; she gets out of breath walking up stairs; and that her back problems combined with her epilepsy and fibromyalgia cause her to lie on the couch often. She testified that she can stand and prepare drinks and meals, but when cooking a hot meal, she can only use the microwave because her legs might give out. She testified that her condition rose to this level in 2010, around the same time she started seeing her pain doctor, who has since gone out of business. She testified that because her pain doctor went out of business, she has to stretch her medicine out and mostly lies around because getting up hurts too badly. She testified that she will go outside and watch her child play with her mother, but cannot play with her child herself. (R. 213)

The claimant testified that she began having grand mal and "clonic tonic" seizures around 2004;[11] was referred to Dr. Hull, a neurologist, for treatment, and currently took Keppra for her seizures. She testified that the Keppra makes her tired and occasionally gives her headaches. The medicine, she testified, makes it difficult for her to wake up in the mornings, and that she wants to sleep often. She also testified that the effects of the

---

[11] The actual term for the claimant's type of seizure is tonic-clonic.

Keppra last until noon and cause muscle pain from lying down too long; that her seizures cause her to look confused, fall to the floor and shake; and that she bites her cheeks during the seizures. She testified that after a seizure she does not remember who she is or her location, and that she takes 10-20 minutes to recover. After recovering from the seizure, the claimant testified that she has to lie down and sleep for most of the remainder of the day. (R. 214-18).

The claimant reported that she is currently experiencing two to eight seizures a month, and that her seizures have been increasing in frequency. She testified that in 2007 she experienced seizures once every six months, and that her seizures began to increase in frequency around 2010. She also testified that she experiences tonic clonic seizures once or twice weekly. (R. 219-20).

When describing her symptoms of fibromyalgia, the claimant testified that her nerves throughout her body feel like they are badly burning. When she is standing or walking, she starts feeling fatigued and begins hurting over her entire body, especially in her back. She testified that she is currently taking Lyrica and Lortab for her symptoms. The Lyrica causes her to feel dizzy and unable to understand what people are saying. She also testified that she has trouble following simple instructions. (R.  221).

The claimant testified that she can stand for 30 minutes before her legs and back start to hurt and that she begins to feel like her legs will give out. When this feeling happens, she testified that she has to lie down because sitting for about 30-45 minutes makes her back hurt as well. She also testified that she can only walk for about 30 minutes at a time. In an eight-hour day, she could sit for one to two hours, walk for about an hour, and stand for about three to four hours with breaks. She testified that repetitive

19

lifting would make her arms hurt. The claimant testified that she is able to take care of her personal needs. (R. 222-24).

The claimant testified that she experiences migraines at least three times weekly. She testified that the migraines make her head feel like it is pulsing. She testified that she was having a migraine with pain at a 9/10 at the current hearing; her current migraine has lasted for around five days; she takes Elavil to alleviate the pain; her migraines make her nauseous; and she stays in a dark room whenever she gets a migraine, and will remain in that room unless it gets worse and she has to go to a hospital. The claimant testified that, because of the persistent severity of her pain, she cannot leave her house for any reason, even to seek relief from a hospital, about 15 days out of a 30-day typical month. (R. 225-28).

The claimant testified that she has severe depression, but at her last visit with her therapist in November, she reported feeling well; however, since her father has become ill, her depression has worsened. She testified that she feels like she is in jail, not wanting to go anywhere or play with her son. (R. 229-30).

The claimant testified that she is currently taking her pain medications, but that they do not seem to be helping. She also testified that before the death of her father, she would wait on him and help him to the bathroom. (R. 242-43).

Amanda Hobbs, the claimant's mother, testified that the claimant helped her look after her now deceased husband by sitting with him or fixing him something to eat in the microwave. She testified that the claimant can partly do chores, starting the chore and then forgetting what she was doing. She also testified that the claimant could fix meals for the mother, with help, and that the claimant could also fix meals for her child. She

testified that the claimant does not play with her child outside. Ms. Hobbs testified that she would take care of the child, more or less, during the day instead of the claimant. (R. 232-34).

Ms. Hobbs also testified about the claimant's seizures. She testified that the claimant experiences grand mal and clonic tonic seizures, and has recently been having episodes where the claimant will have a blank stare and march in place. She testified that the claimant has more seizures when she is under stress. The mother testified that the claimant experienced seizures approximately once a month, and that sometimes the seizure would keep the claimant in bed for a day or two. She testified that the increased frequency of the claimant's seizures began to occur shortly before hospice was called to take care of the claimant's father in September 2011. She testified that the claimant's boyfriend would tell her about the claimant having a seizure during the night once or twice a month. The mother testified that the claimant was taking Keppra for her seizures and that the medication was making the seizures less frequent. (R. 235-40).

A vocational expert, Ms. Martha Daniel, testified concerning the type and availability of jobs that the claimant was able to perform. Ms. Daniel testified that the claimant's past relevant work was as a shipping and receiving clerk, hand packager, and cashier. Ms. Daniel classified the clerk position as medium exertion, skilled work, but stated it could be less than skilled work because a supervisor worked with the claimant; the hand packager position as medium exertion, unskilled work; and the cashier position as light exertion to medium exertion, unskilled work. (R. 244-45).

The ALJ asked Ms. Daniel to assume that an hypothetical individual could occasionally lift and carry, including upward pulling of 20 pounds; could frequently lift

and carry, including pulling of ten pounds; could stand and walk with normal breaks for a total of six hours in an eight hour workday; sit with normal breaks for a total of six hours in an eight hour workday; could occasionally climb ramps and stairs; could understand and remember short and simple instructions, but not detailed or complex instructions; could concentrate for an eight hour workday at two hour increments with all customary breaks; could have occasional contact with the general public, coworkers, and supervisors; could adapt to changes in the work environment that are infrequent and explained to her; perform  no work on ladders, ropes, or scaffolds; and only occasionally balance, stoop, kneel, crouch, crawl, or work around hazardous machinery or unprotected heights could. Ms. Daniel stated the hypothetical individual could not perform the claimant's previous work because the physical demands exceed her packaging and shipping jobs and the contact with the public and coworkers would preclude the cashier work. The ALJ asked Ms. Daniel if other jobs exited in the region or nation that the individual could perform. Ms. Daniel replied that the hypothetical individual could perform work as a bander, classified as light exertion, unskilled work, with 1,000 jobs in Alabama and 50,000 in the nation; cloth folder, classified as light exertion, unskilled work, with 1,000 jobs in Alabama and 40,000 jobs in the nation; and ticket marker, classified as light exertion, unskilled work, with 4,000 jobs in Alabama and 215,000 in the nation. (R. 245-46).

*The ALJ's Decision*

On June 4, 2013, the ALJ issued a decision finding that the claimant was not disabled under the Social Security Act. (R. 199). First, the ALJ found that the claimant met the insured status requirements of the Social Security Act through December 31,

2009, and had not engaged in substantial gainful activity since her amended alleged onset date of April 1, 2008.

Next, the ALJ found that the claimant had the severe impairments of affective mood disorder, history of seizure disorder, and fibromyalgia/chronic pain syndrome. (R.188). The ALJ noted that the claimant's subjective complaints of disabling migraine headaches were inconsistent with the objective medical evidence, and that when considered both singly and in combination with the claimant's other impairments did not constitute a "severe" impairment within the meaning of the Social Security Act. (R. 191).

The ALJ next found that the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ considered whether the claimant met the criteria for listing 11.02 concerning epilepsy. To meet this listing, the claimant would have to demonstrate that her seizures were documented by EEG and accompanied by a detailed description of a typical seizure pattern, including all associated phenomena, occurring more frequently than once a month in spite of at least three months of prescribed treatment with daytime episodes or nocturnal episodes manifesting residuals which interfere significantly with activity during the day. The ALJ noted that based on the claimant's medical history, her seizures did not meet the criteria in listing 11.02.

Additionally, the ALJ considered whether the claimant met the requirements of Listing 11.03 for petit mal seizures, requiring minor motor seizures documented by EEG and by a detailed description of a typical seizure pattern including all associated phenomena, occurring more frequently than once weekly in spite of at least three months

of prescribed treatment with alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day. The ALJ determined that the claimant did not meet these requirements.

The ALJ considered whether the claimant met the requirements of Section 11.04. This listing required evidence of a vascular accident with sensory or motor aphasia resulting in one of the following more than three months post-vascular accident: ineffective speech or communication or significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements, or gait and station. The ALJ determined that the claimant did not meet these requirements.

The ALJ also determined that the claimant's mental impairment did not meet or medically equal the criteria of listing 12.04. In making his finding, the ALJ considered the "paragraph B" criteria, requiring a mental impairment to meet at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintain concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. The ALJ found that no evidence of more than a mild restriction on the claimant's activities of daily living, noting that she could take care of her personal needs and that of her child's, and that she could clean the house, cook, shop, watch TV, and play with her son. He also found no evidence of episodes of decompensation, each of extended duration.

The ALJ also considered the "paragraph C" criteria within Listing 12.04, but found that the evidence failed to establish the presence of the "paragraph C" criteria. (R.

24

191-93).

Next, the ALJ determined that the claimant had the residual functional capacity to occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds; stand and walk, with normal breaks, for six hours in an eight hour workday and sit six hours in an eight hour workday; occasionally climb ramps and stairs, but for safety reasons can never work on ladders, ropes, or scaffolds; can occasionally balance, stoop, kneel, crouch, and crawl; remember short simple instructions but no detailed or complex instructions; concentrate during an eight hour workday at two hour increments with all customary breaks; have occasional contact with the general public, coworkers, and supervisors; and adapt to changes in the work environment that are infrequent and explained to her. (R. 193).

In making this finding, the ALJ considered the claimant's symptoms and corresponding medical record. The ALJ concluded that, although the claimant's medically determinable impairments could reasonably be expected to cause her symptoms, the claimant's allegations regarding the intensity, persistence, and limiting effects of those symptoms were not fully credible when compared with the evidence. First, the ALJ considered the claimant's allegations in light of the medical record. He noted that the claimant alleged that her seizures have been worse since being on Keppra, that the medication makes her tired and causes headaches, and that she experiences five seizures monthly. He pointed to Dr. Hull's treatment records in which the claimant consistently reported improvement with Keppra, and did not indicate that the claimant experienced any side effects from the medication. He pointed out that Dr. Hull's records show that the claimant had only experienced one or two seizures since September 2011.

25

The ALJ stated that the claimant also alleged disabling pain and limitation due to fibromyalgia, but noted that the record showed that the claimant received treatment for pain from Central North Alabama Health Services and Dr. Aggarwal, but had no objective findings other than multiple tender points.[12] The ALJ acknowledged that Dr. Aggarwal noted moderate tenderness in the lumbar paraspinal muscle and limited range of motion by 25%, but the ALJ also noted that the claimant's motor strength, sensation, and reflexes were normal.

The ALJ then considered the claimant's daily activities and determined that they were inconsistent with her allegations of disabling symptoms and limitations. He noted that the claimant performed self-care without assistance; lives alone with her three-year-old son and provides his care; visits with family and friends daily; cleans the house, cooks, shops, watches TV, and plays with her son; can lift 30 pounds; can follow written and spoken instructions; gets along with authority figures; can handle changes in a routine; but complains of stress problems. After considering the medical evidence and the claimant's daily activities, the ALJ found that good reasons existed for questioning the reliability of the claimant's subjective complaints. (R. 194-96).

The ALJ also considered the claimant's allegations regarding her inability to focus, hearing voices, and difficulty following directions as a result of depression. The ALJ noted that the claimant took Xanax, but Mental Health opined that she was selling the medication and stopped prescribing it.[13] He stated that the claimant's mental health records showed that she denied auditory or visual hallucinations; that she improved with

---

[12] The ALJ noted that Dr. Aggarwal did not perform trigger point testing according to his medical record.

[13] The ALJ opined that Mental Health stopped prescribing Xanax out of suspicion the claimant was selling the medication. The relevant medical record indicates that Klonopin was actually the drug in question, but the ALJ's reasoning still follows.

treatment; and that she drove alone to her appointment in September 2010. The ALJ noted that Counselor Nitchen discharged the claimant in April 2012 after missing several appointments and that the claimant has not returned again for treatment.

The ALJ considered Dr. Galusha's[14] consultative psychological evaluation which was unremarkable for any significant symptoms or limitations, and gave no indication of psychosis. The claimant also reported to Dr. Galusha that she was capable of self-care without assistance and indicated that she cooked, cleaned, and washed. Along with her diagnosis of major depressive disorder, severe with psychotic features (provisionl), Dr. Galusha assessed a GAF of 65, indicating moderate to mild symptoms. The ALJ also noted that none of the claimant's treatment records showed any restriction placed on the claimant by a treating physician.

The ALJ gave some weight to Dr. Galusha's opinion of major depressive disorder with a GAF of 65, but gave more weight to the mental health opinion that the claimant carried a consistent GAF of 55, indicating moderate symptoms, since 2009 because of major depressive disorder.[15] He found that the remainder of Dr. Galusha's opinion is consistent with the medical evidence of record and gave it great weight. The ALJ also gave great weight to Dr. Estock, who opined mild to moderate functional limitations, because his opinion was consistent with the medical record.

The ALJ also considered the report and opinion of consultative examiner Dr.

---

[14] Although the ALJ referred to "Dr. Swick," the record contains no evidence of a consultative psychological evaluation of the claimant performed by a Dr. Swick. The ALJ refers to the same examiner as Dr. Galusha in the same paragraph, and the court assumes that the ALJ referred to "Dr. Swick" in error.

[15] The ALJ noted that the Diagnostic and Statistical Manual – Fourth Edition (DISM-IV), published by the American Psychiatric Association, finds a GAF between 60 and 70 indicates moderate to mild symptoms. Using the same source, this court finds a GAF of 55 indicates moderate symptoms.

Lewis and noted that her records showed a normal examination of the claimant, and that the claimant had full range of motion and muscle strength, with the exception of multiple trigger points and strait leg positive. However, the ALJ rejected Dr. Lewis's opinion that the claimant is unable to perform any activities of work. He noted that the opinion was inconsistent with the doctor's own examination and seemed to rely heavily on the claimant's subjective reports of symptoms and limitations. He also noted that, under 20 C.F.R. 404.5127(e) and 416.927(e), the determination of the claimant's inability to work was a decision reserved to the Commissioner. (R. 196-97).

Next, the ALJ, relying on the vocational expert's testimony, found that the claimant is unable to perform any of her past relevant work. The ALJ determined that based on the claimant's age, education, work experience, residual functional capacity, and the vocational expert's testimony, jobs existed in significant number in the national economy that the claimant could perform, including working as a bander, cloth folder, and ticket marker. Thus, the ALJ concluded that the claimant was not disable as defined under the Social Security Act. (R. 198).

*Evidence Submitted to the Appeals Council*

After the ALJ entered his decision, the claimant appealed that decision to the Appeals Council and submitted evidence to it that the claimant alleged was new, chronologically relevant, and material. She presented to the Appeals Council for review the following medical records reflecting medical evaluations and treatment she received after the ALJ decision.

28

The claimant visited Central North Alabama health Services on May 14, 2013 with complaints of pain on a 7/10 scale.  Dr. Katoch diagnosed the claimant with knee pain and fibromyalgia. (R. 170-71).

On June 28, 2013, the claimant requested a refill for Elavil from The Clinic for Neurology because she had headaches more frequently and had run out of her medication. The notes reflected that the claimant "sounded very groggy," with slurred speech when she called. The Clinic noted that Dr. Hull's last prescription for Elavil should have been able to last until her next appointment in September and denied any additional refills until that time. (R. 85.)

`On June 30, 2013, the claimant presented to the Huntsville Hospital emergency room via ambulance with complaints of headache and medication withdrawal. Her headache was sharp, had been coming and going for a month, and was causing her pain at a level of 10/10. She claimed that taking roxycodone alleviated her pain; however, she requested that the hospital help her detox off of roxycodone, Lortab, and Xanax. The claimant's mother had been giving the claimant medication to control her withdrawal symptoms, which included a fever lasting periodically for two weeks prior to her hospitalization.[16] The hospital found that the claimant was addicted to roxycodone, but showed no acute signs of withdrawal, and gave her medication to treat her withdrawal and headache. (R. 142-61).

The claimant presented to Crestwood Medical Center again on August 15, 2013 after experiencing another seizure. The emergency room physician, Dr. Morris, reported that the seizure appeared to be "very drastic," and reported a history of seizures,

---

[16] The hospital records also noted that the fever was a result of a sinus infection.

migraines, fibromyalgia, and lupus. Dr. Morris ordered a CT scan of her head which showed no detrimental change or abnormality. The hospital also performed an EEG that was abnormal "secondary to multiple sharps . . . generalized noted throughout the record." Dr. Morris prescribed Vimpat to control the claimant's seizures and discharged the claimant on September 17, 2013. (R. 96-103).

Huntsville Hospital performed x-rays on the claimant's left and right knees in August 21, 2013; no significant abnormalities were noted. (R. 138). Crestwood Medical Center performed a CT scan of the claimant's head on the same date, noting a history of headaches. No acute changes were found. (R. 125).

On September 6, 2013, the claimant presented to Dr. Greer at the Clinic for Neurology with complaints of severe migraine headaches,[17] that had been  occurring in an increasing pattern. Dr. Greer also noted that the claimant had been prescribed Vimpat for her seizures in August 2013, and that the claimant had experienced two seizures since that time. He diagnosed the claimant with intractable migraines and increased her prescription of Elavil and Vimpat. (R. 83).

On September 8, 2013, the claimant visited Central North Alabama Health services with complaints of lower back pain. Dr. Katoch prescribed trazadone and ordered an MRI of the claimant's lower back. (R. 168). Huntsville Hospital performed an MRI of the claimant's lumbar spine on September 19, 2013, and found that her facet joint and mild discogenic degenerative arthrosis contributed to bilateral neural foraminal stenosis slightly worse on the left than the right at her L5-S1 vertebrae. (R. 136).

---

[17] The claimant began seeing Dr. Greer at the Clinic for Neurology after Dr. Hull retired from practice.

On September 10, 2013 the claimant presented to Crestwood Medical Center with complaints of a seizure and headache. The seizure caused the claimant to lose consciousness, the headache had been persistent for a month, and the claimant had a fever and body aches intermittently for months. The claimant's mother reported that the claimant "has legitimate reason to need narcotics," and "when [the claimant] doesn't get her meds, she gets into mine." The claimant was "very vague" in her complaints and repeatedly asked Dr. Bundow, the emergency room physician, what the doctor would be giving her for pain. Dr. Bundow diagnosed the claimant with headaches, with secondary diagnoses of epilepsy and recurrent seizures, without intractable epilepsy; unspecified myalgia and myositis; systemic lupus erythematosus; alteration of consciousness; and cannabis abuse, unspecified use. (R. 105-09).

The claimant visited Central North Alabama Health Services on October 17, 2013. Dr. Katoch discussed with the claimant her MRI results and opined lower back pain, depression, dysphagia, and insomnia. The claimant's last visit with Central North Alabama Health Services was on December 3, 2013. Dr. Katoch listed the claimant's pain level as a 7/10 due to lower back and neck pain and referred the claimant to the Alabama Pain Clinic for her fibromyalgia. (R. 164-65).

Dr. Pickett, of the Spine and Neuro Center, performed an MRI on the claimant's lower back on January 13, 2014, which revealed some degenerative changes in the lower back with some facet arthropathy without any evidence of significant neural compression. The claimant experienced "exquisite" tenderness over the sacroiliac joints. Dr. Pickett opined that the claimant's pain was arising from the sacroiliac joint, that the pain could

31

not be alleviated by lower back surgery, and recommended conservative treatment such as joint injections. (R. 74).

The claimant visited Dr. Campbell at the Spine Neuro Center on January 15, 2014 with complaints of lower back pain at a level of 8/10. The claimant reported fatigue; shortness of breath; joint pain, with stiffness, swelling, and weakness; muscle pain, cramps and weakness; difficulty walking; frequent headaches; seizures; memory loss or confusion; nervousness or anxiety; sleep problems; and depression. Dr. Campbell gave the claimant an injection for her pain, scheduled a sacroiliac joint injection, and instructed the claimant to begin physical therapy. (R. 130-33). On January 20, 2014, the claimant presented to Huntsville Hospital and received a joint injection into her back to relieve her pain. (R. 134).

On January 30, 2014, the claimant reported to Huntsville Hospital following an episode of four grand mal seizures within 30 minutes of each other. Her seizures continued upon arrival at the hospital. She reported having increased seizures for the past three weeks and could not get an appointment with Dr. Greer. The claimant admitted to using oxycodone after specific questioning from Dr. Crouch, the emergency room physician. The claimant had also taken two grams of Xanax that day. Huntsville Hospital discharged the claimant on January 31. (R. 29-39).

On February 7, 2014, Dr. Greer diagnosed the claimant with epilepsy. He noted that the claimant experienced four seizures of increased intensity on January 21, 2014, with the first one causing her to stare, the second causing her eyes to flutter, and the final two being grand mal seizures. She went to the ER for her seizures on January 30, where the hospital informed her that she was pregnant. Dr. Greer noted that the claimant's

32

seizures were exacerbated by nausea and sleep deprivation, and that she was continuing to experience migraines.[18] (R. 82).

At her one-month follow-up with Dr. Greer, the claimant reported that she experienced a seizure in February that caused her to fall and hit her head, and that her migraines had been increasing in frequency. She experienced migraines every two or three days and felt as though they were getting more severe. Dr. Greer increased the claimant's prescription for Vimpat to address her persistent seizures and increased her prescription for Cymbalta and added Trazodone to control her migraines.

The claimant visited Dr. Campbell at the Spine and Neuro Center on April 15, 2014, and reported a 90 percent decrease in back pain following her joint injections, and that the relief lasted six weeks after the procedure. Physical therapy was not helping, and she was currently experiencing pain at a level of 8/10. Dr. Campbell gave the claimant another toradol injection and scheduled another joint injection. (R. 63-64).

The claimant presented to Crestwood Hospital on April 22, 2014 by ambulance after experiencing multiple seizures and complaining of a persistent headache for a few days prior to the seizure. The EMS noted that the claimant had six seizures or greater while being transported to the hospital and Dr. Pulliam, the emergency room physician, witnessed some additional seizures in the emergency room. Dr. Pulliam noted that "interestingly," the claimant was not postictal and was able to take medication in the emergency room. She opined that the claimant might be experiencing focal seizures and that her migraine headaches could also present as seizure-like activity. The claimant was admitted into ICU for monitoring. She admitted to having taken a lot of Fioricet and

---

[18] Dr. Greer described the nausea as hyperemesis gravidarum, a type of nausea experienced during pregnancy.

Lortab for her pain. The hospital performed a CT of the claimants head and an EEG, and had no remarkable findings. Dr. Pulliam discharged the claimant on April 24, 2014, noting that the claimant had been doing well in the hospital. She opined that the claimant might have some polysubstance abuse and that her seizure episode might have been from withdrawal. (R. 86-95).

On May 7, 2014, the claimant visited Dr. Greer with complaints of seizures, characterized as generalized tonic-clonic movements. She reported that her seizures are usually followed by drowsiness; that she is having trouble walking; that it hurts to move; that she is having muscle spasms; that she is having more frequent headaches since her most recent seizures; that she has felt "very horrible" since her past seizure in April; and that from the moment she wakes up in the morning to the time she goes to bed her entire body feels like it is squeezing. She had not been driving as well. Dr. Greer noted that the claimant had been admitted to Crestwood Hospital after experiencing 24 seizures, which the hospital believes resulted from an overdose on medication she had received from a friend to help her headaches.[19] After noting that the claimant had not experienced any seizures since her discharge from the hospital, Dr. Greer prescribed Vimpat again and expressed optimism that her current regimen should keep her seizure free. (R. 77-78).

Dr. Campbell performed that claimant's second sacroiliac injection at Huntsville Hospital on May 16, 2014. (R. 62). The claimant followed-up with Dr. Campbell at the Spine and Neuro Center on May 27, reporting that the injection provided no relief for her back pain. Her pain was reported at a level of 9/10 and she experienced much tenderness

---

[19] Dr. Greer, at the claimant's appointment on May 7, 2014, seems to be referring to the claimant's hospitalization at Crestwood Hospital on April 22, 2014. While he notes that the claimant experienced 24 seizures in April, Dr. Pulliam's emergency room records indicate that she is unclear exactly how many seizures the claimant experienced that day.

in her lower back with even light touch. Dr. Campbell prescribed a topical cream for the claimant's pain and referred her to another doctor for pain management. (R. 58-60).

## VI. DISCUSSION

The claimant argues that medical records from Chronic Pain Care Services, Central North Alabama Health Services, The Clinic for Neurology, Crestwood Medical Center, and Huntsville Hospital, entered into the record after the date of the ALJ's decision, constituted "new and material" evidence, and that the Appeals Council erred by failing to adequately consider the evidence and remand the case to the ALJ to reconsider in the light of that new, material evidence. Pl.'s Br. 27. This court agrees and finds that the Appeals Council incorrectly concluded that the medical records were not chronologically relevant simply because the records were dated after the time of the ALJ's decision.

When the Appeals Council refuses to consider new, material, and chronologically relevant evidence submitted to it, that decision is subject to judicial review. *Washington*, 806 F.3d at 1320. The district court may determine that the failure of the Appeals Council to adequately consider the new evidence warrants a remand if a reasonable possibility exists that the new evidence would change the administrative result. *See Washington*, 806 F.3d at 1321.

In the instant case, in its denial of review dated January 31, 2015, the Appeals Council acknowledged receipt of the additional medical records and considered the materials dated before the ALJ's decision, but not the materials that were dated after the June decision. (R. 2). The Appeals Council explained that it refused to consider the additional evidence dated after the ALJ's decision because the records concerned a "later

time," and "[did] not affect the decision about whether [the claimant] was disabled beginning on or before [the ALJ's decision]." (R. 2).

The court finds that the Appeals Council erred in this conclusion. While the medical records regarded a later date than the ALJ's decision, the materials are relevant to the ALJ's decision because the new treatment records concern the claimant's seizures, headaches, and back pain from fibromyalgia that existed during the period of time before the ALJ's decision.. *See Washington,* 806 F.3d at 1323 (finding that a physician's opinion dated after the ALJ's decision was chronologically relevant because he based his opinions on the combined effects of the claimants impairments that were present during the period prior to the ALJ's decision); s*ee also Boyd v. Heckler*, 704 F.2d 1207, 1211 (11th Cir. 1983) (considering a "treating physician's opinion" even though "he did not treat the claimant until after the relevant determination date"), *superseded on other grounds by statute*, 42 U.S.C. § 423(d)(5).  The Appeals Council erred in not considering the treatment records to be chronologically relevant.

The treatment records are also material because a reasonable possibility exists that the new evidence may have changed the administrative result. The records discuss the nature and severity of the claimant's physical impairments and further support her allegations in her hearing testimony, which the ALJ characterized in his decision as unsupported by evidence. In discrediting the claimant's complaints regarding her seizures and headaches, the ALJ seemed to rely heavily on Dr. Hull's treatment notes that Keppra controlled the claimant's seizures, that by March 2013 the claimant had only experienced two seizures in the past two years, and that Elavil controlled her migraines. However, medical records dated after the ALJ's decision from the claimant's neurology treating

36

physician, Dr. Greer; from Huntsville Hospital; and from Crestwood Medical Center showed a substantial increase in seizure activity and migraine frequency. These new medical records showed that following the ALJ's decision in June, the claimant had an abnormal EEG, experienced four more seizures in 2013, and greater than ten seizures between January 2014 and April 2014. Further, the record showed that the claimant now takes Vimpat in addition to Keppra for her seizures. Dr. Greer noted that the claimant's migraine headaches had been increasing in frequency and severity, and increased his prescriptions of Cymbalta and Trazodone to control her migraines. The claimant also sought relief from Huntsville Hospital emergency room for her migraines, which she described as a 9/10 in pain severity. In light of this new evidence, a reasonable possibility exists that it would have changed the ALJ's decision.

Moreover, the ALJ disregarded the claimant's complaints of pain caused by fibromyalgia in part because no objective findings existed to support a fibromyalgia diagnosis. The ALJ noted that, while Dr. Aggarwal diagnosed chronic low back pain and neck pain due to fibromyalgia, he performed no diagnostic or laboratory testing. However, the new medical records from Central North Alabama Health Services and from the Spine Neuro Center submitted to the Appeals Council showed that the claimant continued to report pain levels of 7 and 9/10 on the pain scale following the ALJ's decision. Dr. Katoch ordered an MRI of the claimant's spine from the Spine Neuro Center that showed that the claimant's pain arose from her sacroiliac joint. One of the primary characteristics of fibromyalgia is the presence of widespread pain in the joints. SSR 12–2p, 77 Fed.Reg. 43640, 43641 (July 25, 2012). Dr. Pickett of the Spine Neuro Center also noted "exquisite" tenderness over the same joint. The claimant received a

sacroiliac joint injection in January 2014 that seemed to relieve her pain; however, a second joint injection in May 2014 had no such relief. This objective evidence could support the claimant's fibromyalgia diagnosis, and a reasonable possibility exists that this evidence could have changed the administrative result.

For the foregoing reasons, this court finds that the Appeals Council erred by failing to properly consider the new evidence submitted by the claimant and for not remanding the case to the ALJ based upon that evidence.[20] This case should be reversed and remanded pursuant to 42 U.S.C. §405(g).

VII. CONCLUSION

For the reasons as stated, this court concludes that the decision of the Commissioner is due to be REVERSED AND REMANDED.

The court will enter a separate Order in accordance with the Memorandum Opinion.

DONE and ORDERED this 26th day of September, 2016.

_Karon O. Bowdre_

**KARON OWEN BOWDRE**
CHIEF UNITED STATES DISTRICT
JUDGE

---

[20] This court finds that the new evidence of poly-substance abuse is not chronologically relevant to the ALJ's previous decision. On remand, however, the ALJ may consider whether the claimant has a poly-substance addiction and the effects of that addiction.